# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 22, 2010

## STATE OF TENNESSEE v. BRIAN MARK DRIGGERS

**Direct Appeal from the Circuit Court for Marshall County**
**No. 08-CR-163     Robert Crigler, Judge**

_____

**No. M2009-02124-CCA-R3-CD - Filed February 1, 2011**

_____

A Marshall County jury convicted the Defendant, Brian Mark Driggers, of forgery and misdemeanor theft, and the trial court sentenced him to one year and three months to be served in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions, that the State failed to prove venue, and that the trial court erred when it denied the Defendant an alternative sentence.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

John D. Schwalb (on appeal), Franklin, Tennessee, and Roger Clay Parker (at trial), Shelbyville, Tennessee, for the Appellant, Brian Mark Driggers.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; Weakley R. Barnard, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

A Marshall County grand jury indicted the Defendant for six counts of forgery under $500 and six counts of theft of property under $500.  The following evidence was presented at the Defendant's trial: Veeda Kielbasa testified that she and her husband, Robert Kielbasa,

owned a horse ranch, Free Spirit Farm, located in Lewisburg, Marshall County, Tennessee. The Kielbasas's farm provided horse training and boarding services for horse owners.

Mrs. Kielbasa testified that she employed the Defendant at Free Spirit Farm during June, July, and part of August 2008. Specifically, the Defendant was hired to bring in more boarders for the business because the Kielbasas' barn was only half-full. The Kielbasas were hoping this extra revenue would cover their overhead expenses. Mrs. Kielbasa said that, at the time the Defendant was hired, they employed four other individuals whom the Defendant was expected to manage while Mrs. Kielbasa performed the management of the farm itself. Mrs. Kielbasa testified that she paid all of the bills, including payroll, from a designated checking account with First Commerce Bank for Free Spirit Farm. Although "there were times" where payroll would be paid from the Kielbasa's personal checking account, the "majority" of the time employees were paid from the business bank account. Mrs. Kielbasa testified that she primarily wrote the payroll checks but that, on occasion, when she was out of town, her husband wrote the payroll checks. Mrs. Kielbasa estimated that she would go out of town on business approximately six times a year.

Mrs. Kielbasa testified that there was an office in the barn where she kept all the business paperwork. When Mrs. Kielbasa was not there, the office was locked. Mrs. Kielbasa said that she usually kept the business checkbook in her home but that she occasionally kept the checkbook at the barn office in a locked filing cabinet. Mrs. Kielbasa said she and her husband were the only two authorized signatories on this business account. Mrs. Kielbasa identified a bank signature card authorizing only her and her husband's signatures for the bank account and testified that no else had ever been authorized to sign for this business account.

Mrs. Kielbasa testified that occasionally an employee would use a farm vehicle and she would reimburse the employee for any diesel they purchased while using the vehicle. When she reimbursed employees, her practice was to write the purpose of the reimbursement on the memo line of the check.

Mrs. Kielbasa testified that prior to hiring the Defendant, the business sometimes made a profit but only "br[oke] even" at other times. The Kielbasas decided to hire Dale Rudin to hold instructive clinics to teach clients how to work with difficult horses rather than employ horse trainers. She explained that they were making this change to "simplify things." Mrs. Kielbasa recalled that Rudin knew the Defendant and told Mrs. Kielbasa that, if the Defendant was hired, Rudin and the Defendant could secure enough clients to fill the unused stalls in the barn within thirty days.

Mrs. Kielbasa testified that Rudin brought the Defendant to the Kielbasa's home and that they discussed a potential position for the Defendant at Free Spirit Farm. Approximately a week later, Mrs. Kielbasa met with the Defendant to discuss the position once again,

confirming that the Defendant would be able to secure additional boarders for the barn. Mrs. Kielbasa hired the Defendant during this meeting, and the two agreed upon a salary of $750 to be paid at the end of every work week.

The Defendant began work on June 16, 2008. Thereafter, he approached Mrs. Kielbasa about hiring additional employees, and Mrs. Kielbasa agreed. The Defendant hired Lori Fontez, Joey Gilly, and Kyle Graves, all acquaintances of the Defendant.

As the summer progressed, it became apparent to Mrs. Kielbasa that the Defendant was not able to secure additional boarders to fill the empty barn stalls as they had discussed. Mrs. Kielbasa testified that, in the middle of July, she called the Defendant into the barn office and told him that she would need to let both the Defendant and Rudin go because they were not bringing in the clients as agreed upon. About a week after that meeting, a client asked Mrs. Kielbasa to assist him in delivering eight horses to Las Vegas. The Defendant was part of the discussion and arranged to drive to Las Vegas with Joey Gilly to deliver the eight horses and then pick up four horses, delivering two of those horses to Mexico and the other two horses to Texas on their return trip. The Defendant told Mrs. Kielbasa that the business would make a $1200 profit from these deliveries.

Mrs. Kielbasa recalled going to the barn on July 26, the morning the Defendant was scheduled to leave for the horse delivery. The Defendant informed Mrs. Kielbasa that "some stuff ha[d] come up" and Gilley could no longer go and the Defendant needed to remain at the farm to meet with someone interested in purchasing horses. The Defendant asked Mrs. Kielbasa to deliver the horses. Mrs. Kielbasa agreed to make the delivery but refused to travel into Mexico. She instructed the Defendant to ask the Mexico buyer to meet her in Arizona to pick up the horses. The Defendant told Mrs. Kielbasa that he "had it all worked out." Mrs. Kielbasa said that, the day she left to drive to Las Vegas, the business checkbook was in the filing cabinet in the barn office because she had been paying suppliers. Mrs. Kielbasa gave the Defendant her keys to the barn office to give him access to the office for phone calls or to meet with clients. In her rush to leave, Mrs. Kielbasa did not think about the fact that the key to the locked filing cabinet was also on the key ring.

Upon arriving in Las Vegas, Mrs. Kielbasa learned that the Defendant did not actually arrange for the Mexico horse buyer to pick up the horses in Arizona, that the delivery of the horses to Texas was not part of the agreement, and that the agreed upon price for the delivery was much less than the Defendant had told Mrs. Kielbasa. Without the four horses the Defendant had told Mrs. Kielbasa he had arranged for delivery on the return trip to Tennessee, Mrs. Kielbasa drove back to Lewisburg, arriving between 9:30 p.m. and 10:30 p.m. the night of July 31. The next morning, Mrs. Kielbasa learned that her husband had closed the barn, so she paid the employees their final wages. Mrs. Kielbasa testified that she was current on the Defendant's wages and that she paid him his final check for the previous week's work of $750.

Sometime shortly after the barn closed, Mrs. Kielbasa reviewed copies of returned checks for the business account and noticed that some of the checks bore a signature of her name that was in neither her nor her husband's writing. Mrs. Kielbasa, based on working with the Defendant, identified the handwriting on the checks as the Defendant's handwriting. Mrs. Kielbasa testified that her husband told her he had not given the Defendant permission to write the checks.

The first check that had Mrs. Kielbasa's unauthorized signature was written to Burke Building Supplies for twelve dollars on July 30, 2008, during which time Mrs. Kielbasa was returning from her delivery of the horses to Las Vegas. The second check was written on the same day and made out to the Defendant for $500. The third and final[1] check was dated July 31, 2008, and was written to Kyle Graves for $500. On the memo line of this check was written "Pay for labor." Mrs. Kielbasa testified that she did not give the Defendant permission to write the checks to Burke Supplies, Kyle Graves, or himself. Mrs. Kielbasa recalled that on August 1, when she wrote the Defendant his final paycheck for the previous week's work, he never mentioned writing any checks for the business.

Robert Kielbasa testified that his wife was the primary operator of Free Spirit Farm, while he worked full-time in Nashville. Mr. Kielbasa was not involved in hiring the Defendant and was unaware of the Defendant's salary. Mr. Kielbasa testified that he was concerned about the expense of the farm, which he said was a "very, very sore point" between himself and his wife. Mr. Kielbasa testified that he never authorized anyone to sign checks for the business account and that he never gave the Defendant permission to sign Mrs. Kielbasa's name to a check.

On cross-examination, Mr. Kielbasa testified that Kyle Graves was repairing a utility trailer and needed lumber for the repair. Mr. Kielbasa denied giving the Defendant permission to use the business account checkbook to buy the lumber from Burke Building Supply store. He explained that he himself he went to Lowe's and purchased the needed lumber for the trailer repair. Mr. Kielbasa said he did not recall talking with the Defendant about a $500 fuel reimbursement, but he acknowledged that the Defendant occasionally used his personal vehicle for farm work.

Rick McKenzie, a manager at Burke Building Supply store, in Lewisburg, Tennessee, testified and identified a July 30, 2008, invoice for a twelve-dollar purchase. The invoice indicated that the items purchased were two one-by-six twelve-foot treated planks that were picked up by the customer the day of purchase. McKenzie identified the Free Spirit Farm

---

[1]During the trial, there was testimony of another check written by the Defendant on the business account without the Kielbasa's permission. This check, however, was passed in another county and, thus, is not at issue in this case.

business check received for the invoice.

Pavlova Greggs, vice-president of teller operations at First Commerce Bank, testified that, whenever a check is cashed at First Commerce Bank, it is stamped with the date, the name of the teller receiving the check, the amount of the check, and the time. Viewing the $500 check written to the Defendant and cashed at First Commerce Bank in Marshall County, Tennessee, she stated that the check was cashed on July 30 at 3:12 p.m. by teller number six. Greggs said that, based upon a videotape of the transaction, she determined that the Defendant's wife, Penny Driggers, cashed the check. The videotape, which was played for the jury, showed Driggers giving the bank teller a check from the Free Spirit Farm business account and receiving $500 in cash. Greggs explained that the bank required the signature of both the person to whom the check was written and the person cashing the endorsed check. The check in this case was signed by both the Defendant and his wife.

Greggs then viewed the check made out to Kyle Graves and stated that it was cashed in Marshall County, Tennessee, on August 1 at 9:10 a.m. by teller number six, in the amount of $500. Based upon this information, Greggs located the videotape of this transaction, which showed Kyle Graves receiving $500 from the Free Spirit Farm business account.

Greggs verified that the $12 check written to Burke Building Supply store, dated July 30, was cashed on July 31. This transaction also occurred in Marshall County, Tennessee.

Greggs identified the signature card for the Free Spirit Farm's business checking account and confirmed that the only signatories were Veeda and Robert Kielbasa.

Kyle Graves testified that the Defendant hired him to work at Free Spirit Farm in 2008. Graves said that he worked for about a week and was paid at the end of the week. Graves recalled that he and Defendant were in the Free Spirit Farm barn when the Defendant said, "Let's get you paid" and walked over to the Defendant's truck. Graves said the Defendant retrieved a big "company checkbook" from the truck and wrote a check for Graves's wages. Graves said that, because this occurred at the end of the day, he waited until the next morning to cash the check at First Commerce Bank in Lewisburg. Graves agreed that the bank videotape showed him cashing the Free Spirit Farm check. Graves denied noticing that the signature on the check was Veeda Kielbasa explaining that he "didn't pay attention." Graves identified his signature on the back of the check and denied knowledge that the check was a forgery.

Norman Dalton, a Marshall County Sheriff's Office Captain, testified that Robert Kielbasa reported a check forgery on August 13, 2008. Captain Dalton spoke with the Defendant regarding the checks a couple days later. Captain Dalton recalled that the Defendant admitted he wrote and signed the checks but explained that Robert Kielbasa had given him permission to write the $500 check for the Defendant's fuel and expenses and the

twelve dollar check for two pieces of lumber purchased from Burke Building Supply store. Captain Dalton then spoke with Robert Kielbasa who maintained that he had not given anyone permission to sign the business checks.

Dale Rudin, a horse trainer, testified she met the Defendant at a horse training facility. Rudin said that she currently worked at Maverick Horse and Cattle Company, which is owned by the Defendant. Rudin recalled that she introduced the Defendant to the Kielbasas. The Kielbasas hired the Defendant to take care of the barn, but, after a week or two, Mrs. Kielbasa called a meeting and told the employees that the Defendant was going to manage the barn and use the barn office. Rudin recalled that the Defendant had keys to the barn office and that whenever she needed anything, she reported to the Defendant rather than the Kielbasas. Rudin said that, after the Defendant was hired, she did not see the Kielbasas on the farm very often. Rudin said that the Defendant worked very long hours at Free Spirit Farm and would drive his personal vehicle for farm work.

Based upon this evidence, the jury convicted the Defendant of two counts of forgery, a Class E felony, and one count of theft of property under $500, a Class A misdemeanor.

## B. Sentencing Hearing

At the sentencing hearing, the following evidence was introduced: Terese Frazier, a Department of Probation and Parole employee, prepared the presentence report in this case and testified that the Defendant had a 2003 federal conviction for fraud. The conviction was based on fraud perpetrated by the Defendant on a lender. Frazer said that the Defendant reported to her that he received a loan on the basis he would plant a certain type of crop and then he planted a different type of crop. The restitution owed on this bank fraud conviction was $219,713.13. Frazier learned that the Defendant paid the restitution at $150 a month until he was discharged from federal probation. Having failed to make any further payment since being discharged from federal probation, the current restitution debt was $203,839.92.

Frazier also investigated the Defendant's employment history. Frazier testified that she learned that the Defendant was employed at Tennessee Equestrian Hospital for eight months initially in maintenance but, due to an injury, he was moved to an office job. Frazier said that the owner of the facility indicated he was unaware of any thefts during the Defendant's employment but that the Defendant was not welcome on the property because the Defendant created "dissension in the office" during his employment. Frazier testified that she collected victim impact statements from both of the victims in this case, Robert and Veeda Kielbasa.

Veeda Kielbasa testified that she had not yet received any restitution from the Defendant. Mrs. Kielbasa further stated to the trial court, "I really feel like [the Defendant] will do this to somebody else. If you let him walk, he is going to do it again."

Following the hearing, the trial court merged the two counts of forgery. The trial court applied several enhancement factors to the Defendant's sentence and sentenced him to one year and three months for the forgery conviction, a Class E felony, and to eleven months and twenty-nine days for the theft conviction, a Class A misdemeanor. The trial court ordered all sentences to run concurrently for an effective sentence of one year and three months, to be served in the Tennessee Department of Correction.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his convictions, that the State failed to prove venue, and that the trial court erred when it denied the Defendant an alternative sentence. We will address each of the Defendant's issues in turn.

## A. Sufficiency of the Evidence

The Defendent asserts the evidence is insufficient to sustain his convictions because the jury acquitted him of the forgery count for the check on which the Defendant admitted signing Mrs. Kielbasa's name. Further, the Defendant contends that the evidence clearly showed that the Defendant's wife, and not the Defendant, passed the check which was the basis for one of the two forgery convictions. As to the theft conviction, the Defendant asserts that the State failed to prove that the Defendant actually received the proceeds of the check his wife cashed. The State counters that the evidence was sufficient to sustain the convictions, and that inconsistency between verdicts does not nullify the convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d

856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant's primary contention as to sufficiency is that the verdicts are facially inconsistent because the jury convicted the Defendant for forging the check he admitted writing to himself but acquitted him on the charges of forgery and theft for the check the Defendant admitted writing to Kyle Graves. Our Supreme Court has held "[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment." *Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973). A conviction will be upheld if "the evidence establishes guilt of the offense upon which the conviction was returned." *Id*. Therefore, the Defendant's acquittals did not render his remaining convictions void. We will now consider whether the evidence establishes his guilt for the offenses of forgery and theft under $500.

In this case, the Defendant was convicted of forgery under two separate theories of forgery: (1) that the Defendant made the check; and (2) that the Defendant "otherwise utter[ed]" the check. Forgery, as charged in this case, is defined as follows:

> (a) A person commits an offense who forges a writing with intent to defraud or harm another.

(b) As used in this part, unless the context otherwise requires:

(1) "Forge" means to:

(A) Alter, make, complete, execute or authenticate any writing so that it purports to:

(i) Be the act of another who did not authorize the act;

. . . .

(c) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)[.]

*See* T.C.A. § 39-14-114(a), (b)(1)(A)(i), and (b)(1)(c) (2009).

The Defendant was also convicted of theft of the proceeds of the $500 check he wrote, and his wife cashed. A conviction for theft in this case required the State to show that the Defendant "with intent to deprive the owner of property . . . knowingly obtain[ed] or exercise[d] control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2009). The jury in this case was given an instruction as to criminal responsibility. Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007). Tennessee Code Annotated section 39-11-402(2) provides that a defendant is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense." A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both. T.C.A. § 39-11-401(a). "Each party to an offense may be charged with commission of the offense." T.C.A. § 39-11-401(b).

The evidence, considered in the light most favorable to the State, proves that, while working for the Kielbasas at Free Spirit Farm, the Defendant had access to the office where the business checkbook for the farm was sometimes kept. While Mrs. Kielbasa was out of town, the Defendant wrote a $500 check payable to himself and signed Mrs. Kielbasa's name as the payor. The Defendant endorsed the check, as did his wife, and the Defendant's wife cashed the check at the bank. The Defendant admitted writing one check to himself and one to Kyle Graves and explained that he wrote the check to himself as a reimbursement for work-related expenses. Neither Mr. Kielbasa nor Mrs. Kielbasa ever authorized the Defendant to sign a check in Mrs. Kielbasa's name. The jury, by its verdict, accredited the Kielbasas'

testimony. Credibility determinations of trial testimony are left to the jury. *See Bland*, 958 S.W.2d at 659. Based upon this evidence, we conclude that a jury could find beyond reasonable doubt that the Defendant is guilty of forgery and theft under $500.

The Defendant also challenges the jury's conviction of forgery under the theory that the Defendant passed or "otherwise utter[ed]" the forged check. At trial, the State proceeded under two theories of forgery: (1) that the Defendant made the check, and (2) that he "uttered" the check. The jury found the Defendant guilty under both theories of forgery, and the trial court merged the forgery count based upon the Defendant having "uttered" the check into the forgery count based upon the Defendant making the check. The Defendant complains that the proof established that his wife rather than he himself passed the check. The jury was charged, however, with criminal responsibility. Under the theory of criminal responsibility for the acts of another, it is not necessary for the offense to be committed by one's own conduct. *State v. Ball*, 973 S.W.2d 288, 293 (Crim. Ct. App. 1998). Whereas the Defendant did not personally take the check to the bank, he wrote the check to himself and signed Mrs. Kielbasa's name to the check. He then endorsed the check, and his wife took it to the bank to be cashed. The Defendant told the sheriff's deputy that he wrote the check to reimburse himself for expenses. Based upon this evidence, the jury could conclude that the Defendant was guilty of forgery under either theory of forgery. The Defendant is not entitled to relief as to this issue.

Finally, the Defendant asserts that, because the State failed to prove that the Defendant received proceeds from the check cashed by his wife, the evidence was insufficient to support his theft conviction. The Defendant wrote a check for $500 on the farm business checking account. The Defendant endorsed the check, and his wife cashed the check and left the bank with the proceeds. The Defendant explained to the sheriff's deputy during the investigation, after the check had been cashed, that he wrote the check to reimburse himself for work-related expenses. The Kielbasas denied giving the Defendant permission to sign a check in Mrs. Kielbasa's name for reimbursement of work-related expenses in the sum of $500. From these facts, a jury could infer that the Defendant, with the intent to deprive the Kielbasa's of the $500, obtained control over the proceeds of the check without the owner's effective consent as required for a theft conviction. *See* T.C.A. § 39-14-103. The evidence is, therefore, sufficient to support his conviction for theft, and he is not entitled to relief as to this issue.

**B. Venue**

Proof of venue is necessary to establish the trial court's jurisdiction. *See Harvey v. State*, 376 S.W.2d 497, 498 (Tenn. 1964); *Hopson v. State*, 299 S.W.2d 11, 14 (Tenn. 1957). "Venue is a question for the jury, and can be established by circumstantial evidence." *State*

*v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006) (citing *State v. Hamsley*, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984); *State v. Bennett*, 549 S.W.2d 949, 950 (Tenn. 1977)). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. *Id*. at 102 (citing *State v. Johnson*, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)). The State only needs to prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. *See* T.C.A. § 39-11-201(e); *Bennett*, 549 S.W.2d at 949-50; *State v. Anderson*, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). Slight evidence will be sufficient to carry the State's burden if the evidence is uncontradicted. *State v. Bloodsaw*, 746 S.W.2d 722, 726 (Tenn. Crim. App. 1987).

The Defendant contends that the State failed to prove venue in this case. We disagree. The evidence showed that the Defendant was employed at Free Spirit Farm located in Marshall County. The checkbook was in the barn office and Graves testified to seeing the Defendant in possession of the business checkbook at the barn during which time the Defendant wrote a check to Kyle Graves and signed Mrs. Kielbasa's name. The check the Defendant made out to himself was cashed at a bank in Marshall County. Further, there was no evidence indicating these crimes occurred any place other than Marshall County. Based upon this evidence, the jury could reasonably infer that the Defendant's offenses occurred in Marshall County. The Defendant is not entitled to relief as to this issue.

### C. Sentencing

The trial court sentenced the Defendant as a Range I, standard offender to one year and three months at 30% for his forgery conviction, a Class E felony, and to a concurrent eleven months, twenty-nine days for his theft conviction, a Class A misdemeanor, for an effective sentence of one year and three months. The Defendant appeals this decision, arguing that the trial court erred when it denied him an alternative sentence. The State responds that, because the trial court's findings are supported by the record, no sentencing error occurred.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2006), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833,

847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2006).

Due to the 2005 amendments to the Sentencing Reform Act, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6) (2006)). Instead, a defendant not within "the parameters of subdivision (5) [of T.C.A. § 40-35-102], and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." *Id*. (footnote omitted). T.C.A. § 40-35-102(6); 2007 Tenn. Pub. Acts 512. Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider " them. T.C.A. § 40-35-102(6).

A defendant seeking probation bears the burden of "establishing [his] suitability." T.C.A. § 40-35-303(b) (2006). As the Sentencing Commission points out, "even though probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303 (2009), Sentencing Comm'n Cmts.

When sentencing the defendant to confinement, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(A)-©) (2009). In choosing among possible sentencing alternatives, the trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment." T.C.A. § 40-35-103(5); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); *Dowdy*, 894 S.W.2d at 305-06.

At the conclusion of the sentencing hearing in this case, the trial court sentenced the Defendant to an effective sentence of fifteen months incarceration as a Range I, standard offender. The trial court then set out to determine the manner of service. The trial court first stated that, in determining the Defendant's sentence, it was considering the evidence adduced at the trial and the sentencing hearing in this case, the presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of the Defendant's criminal conduct, the evidence of applicable statutory mitigating and enhancing factors, and the defendant's potential for rehabilitation. After considering enhancement and mitigating factors, the trial court set the length of the Defendant's sentence at one year and three months.

The trial court then considered the statutory factors for determining whether to order a sentence of confinement. The trial court found that the Defendant did not have a long history of criminal conduct based upon his one prior Federal conviction. In considering whether confinement was necessary to avoid depreciating the seriousness of the offense, the trial court stated that this factor "is true in all criminal cases" and that "like all criminal cases it is true to some extent in this case." The trial court noted that the Defendant's conviction was a class E felony, which is the least serious felony under Tennessee law. The trial court also found that measures less restrictive than confinement had recently been applied unsuccessfully to the

Defendant based upon the fact that the Defendant had been discharged from his Federal probation on July 30, 2008, and within six months of this discharge had committed another offense. The trial court placed "great weight" on the large amount of restitution involved in the Defendant's Federal conviction. Based upon these findings, the trial court denied the Defendant an alternative sentence.

The Defendant is responsible for showing that the trial court improperly sentenced him, and we conclude that he did not meet this burden. The Defendant had just finished a sentence of supervised release for a bank fraud conviction, a crime, like the present case, which involves dishonesty. The Federal indictment for that conviction indicates the offense involved multiple acts and an extended series of misrepresentations by the Defendant. Upon discharge from his Federal probation, the Defendant discontinued making the remaining payments on the $219,713.13 restitution owed for his criminal conduct. Additionally, shortly after his discharge from Federal probation for the bank fraud conviction, the Defendant secured employment with the Kielbasas. The Defendant then used this position to obtain business checks and write unauthorized checks using Mrs. Kielbasas name. This supports the trial court's denial of an alternative sentence based upon the fact that measures less restrictive than confinement have recently been unsuccessfully applied to the Defendant. Even if we ignore the Defendant's failure to complete restitution and deem the Defendant to have "successfully completed" his Federal probation, it is difficult to say that the Defendant was successfully rehabilitated by his years on Federal probation because he began committing crimes again shortly after the expiration of the Federal sentence.

Based upon the foregoing, we conclude that the trial court appropriately followed sentencing guidelines, made findings of fact adequately supported by the record, and gave due consideration to Sentencing Act principles and factors. We, therefore, affirm the judgments of the trial court.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE